Good morning, Your Honors. May it please the Court, my name is Kevin Lau. I'm appearing on behalf of the appellants, Cnty of Los Angeles, Los Angeles County Sheriff's Department, City of Palmdale, and Detective Rod D. Roberts. This appeal, Your Honor, arises out of certain pre-trial procedures and whether or not their application in this case were unconstitutional. Now, your appeal is the purported appeal of qualified immunity? That is correct, Your Honor, yes. Didn't you fail to timely appeal that? Well, Your Honor, I know that this was an issue we discussed in our briefing and it had to do with whether or not the first motion for qualified immunity was a summary judgment motion or not. The Court treated it as a summary judgment motion for qualified immunity and the second Court restated that, said it had already been denied. That is correct, Your Honor. However, I believe that what we had done in the second motion was actually a renewed motion for summary judgment. That's not what the Court thought you'd done. Well, Your Honor, I'm not quite sure if that's what the Court thought or not. I mean, we had presented additional evidence in support of our renewed motion for summary judgment, but the Court went back and basically adopted the earlier opinion and without really, in my opinion, looking at some of the additional evidence that we had submitted to the Court which was relevant to the issue of qualified immunity. Well, let's assume you took the appeal from the right order. The disputed facts were then not on the issue of qualified immunity. So does that mean that the order is not appealable? Well, Your Honor, I don't think that the appeal was on the disputed facts. I think what it was is that on an appeal of an order denying qualified immunity on a motion for summary judgment, I have assumed the truth of the allegations as they were presented by the nonmoving party in this case. And on that basis, I still believe that I'm entitled to or that my clients are entitled to. No. Summary judgment has to be undisputed facts. That's correct, Your Honor. You can't just assume that one side's story is correct. Well, Your Honor, as I understand it, on an appeal from an interlocutory order where summary judgment has been denied based on qualified immunity, that I can proceed in this Court by assuming the truth of the nonmoving party's fact, even if there are some disputes. Do you believe there are disputed facts in this motion for summary judgment? No, Your Honor. I think that under the facts imbued in the light most favorable to the nonmoving party, which in this case are the entire system. There are no disputes because we're just going to see them your way? Oh, no. Actually, I'm not saying that you should see them their way and that we would still prevail on the issue of qualified immunity. Well, how could you do that in this case? It's a very complicated fact situation involving Robert's conduct. Well, I understand that, Your Honor. I think what I tried to do in my brief was also to demonstrate that there were a number of undisputed facts that basically I don't believe that the district court applied in determining whether or not qualified immunity applied. For example, with respect to the free trial lineup, as I indicated in my brief, I don't think that the court really gave significance to one of the Neal v. Bigger factors having to do with the ability of my client, the fact that she was not merely a witness to a crime. She was an actual victim of the crime, and I know I expressed this at great length in my brief. I think that these are facts that the district court didn't even consider that would really tip the balance for me on the issue of qualified immunity and on behalf of Detective Roberts. That sounds like a factual issue of par excellence. Well, again, Your Honor, since they are undisputed facts, we can just take those facts as established, along with viewing the facts most favorable to those, if there was a dispute, viewing those facts in the light most favorable to the appellees in this case. Briefly, Your Honor, two additional points that I wanted to make. With respect to showing the photographic lineup, Detective Roberts showed the photographic lineup to the witnesses immediately before they testified at the preliminary hearing, and the appellees have raised this as being one issue where this was a constitutional violation. Under the authorities that I've looked at and have cited in my brief, it appears that because this was a subsequent identification that Ms. Andrew Ho had already identified the suspect in this matter, that no constitutional violation occurred. If the court had any additional questions at this time, I would like to reserve my time for the additional appellees. All right. Do you, on the same appeal? Because you're not getting 15 minutes for each appeal. Your Honor, we had sat down before, and we've divided up our time. And that's why, for respect for my other counsel here on the related appeal, I was trying to save them some time as well. Okay. So you're going to take up the related appeal now? Yes, Your Honor. Okay. And if I could, Your Honor, if there's any time left, I would like to reserve that for any reply, since I am the appellant on the related case. Right. Right. Thank you, Your Honor. Okay. So but maybe you want to hear what Counsel for Titus says first and show the appellees. Yes. Okay. So Counsel for Titus. Thank you, Your Honor. Good morning. Well, it seems to me that basically what counsel is doing is characterizing disputed facts as undisputed, and that's what's really going on here. Frankly, I'm inclined to submit based upon what the Court's questions are that are being asked. I think that's what's going on. All right.  Okay, Your Honor. The appeal regarding the summary judgment that was granted in favor of Andujo and Delgado and thus against in favor of G&K and the apartments was based upon one premise, and the premise was that if Andujo and Delgado submitted their declaration saying that, Hey, I did not know Mr. Titus. I've never met him before. We had no malicious intent towards him. And frankly, I mean, we don't have any evidence that suggests that they knew Mr. Titus, that they deliberately planned and focused on Mr. Titus as a person that they wanted to or they had any intention of saying that he did it. The problem that we have with Ms. Andujo and Mr. Delgado is that they expressly knew that Mr. Titus was not the person that committed these crimes. They expressly knew that. Now, this is out of their own mouth. They testified in deposition. Ms. Andujo had forgotten that she had changed her mind in court, and she had – let's revisit the facts so I can focus the Court. Initially, she went into court, and after meeting with Detective Roberts and after Detective Roberts going over the photographs with Andujo and Delgado, they came out and testified that Mr. Titus was the 300-pound criminal that assailed them. Now, just prior to that, just prior to that, they were sitting in the courtroom next to Mr. Titus and his wife, and they didn't recognize him. They didn't know who they were because Mr. Titus is 180 pounds, and the person that assailed her was described as 300, 350 pounds. So that's the basis for the finding of malice? No. Because they didn't recognize him? No. Now, this is what Ms. Andujo testified. Actually, Mr. Delgado testified. Now, when they left the courtroom on the day that they testified that Mr. Titus was him, this is not a preliminary hearing. This is a trial. When they left the trial, the trial court, Ms. Andujo turned to Mr. Delgado in the parking lot and told him, yeah, I know it's not him, and they left. They left the courtroom. So what she also did in the courtroom, there was a problem. She initially in the trial, and she first got to trial three months after the preliminary hearing. She testified. She was confronted by the judge, and the judge said, well, do you recognize the female tenant? Yes, recognized her right away. Do you recognize Mr. Titus? Yes, I recognize him from the preliminary hearing. Well, the judge got a little bit curious. He asked, well, is he the person that committed the crime? And she said, no, I don't, you know, he doesn't look like the person that committed the crime. So what happened then, the court took a recess and gave the prosecutor the option of dismissing Mr. Titus. What happened during the recess, Detective Rodney Roberts escorted Delgado down from the conference room, and Delgado testified out of hearing of the jury that, yes, that's him, only he appears smaller. That's what she said, he looks smaller. Then they recalled the jury, and Ms. Andujo comes in, and she testifies, now that he stood up, I recognize him, only he appears much larger. So one person is saying he's much larger, and one person is saying he's a lot smaller. And then, I mean, so she indicated he appears much larger. It looks like he gained a lot of weight. What is your theory of malice? He lost a lot of weight, I'm sorry. Your theory of malice is under the, I assume, the indifference to prosecution standard? The theory of malice, and I'm just having a hard time, and so is co-counsel. We're just having a hard time with this, understanding that somebody that goes into court and testifies that the defendant is the criminal, while they know he's not him, just to cooperate with the police. That's the problem that we're having. Now, there's really nothing else. I mean, we don't know what their intentions were. We think their intentions were, according to the evidence, to cooperate with the police. Whatever the police did, they did. Whatever they asked them to do, they did. And I don't believe for a second that she didn't know Titus. That's undisputed. He's never met her. She's never met him. But they knew it wasn't him. They absolutely knew. They knew because of the weight, and they knew because they expressly both stated that they knew it wasn't him. They knew it wasn't him. But besides testifying, they also helped the prosecution by testifying that he lost a lot of weight, and Delgado got it wrong. He said, well, he appears larger. Apparently, he didn't get his instructions right. That's the inference that we're gathering from this evidence. So that's what all this stands on, the decision of Judge Wright stands on, his understanding that if they submit a declaration, that they have no malice, personal malice or grudge or ill will towards Mr. Titus, they're off the hook. We say no. They say that. But on the other hand, the objective evidence is otherwise. Now, there's one case that I found that speaks of this, and that's Singleton v. Singleton. And it states that when you know somebody is not the person that did the crime, that's evidence of malice. You know, it looks to me like you need a fiction to make your day, because the difference in the weight loss, and I recognize it's there, it was 50 pounds, I think. No. Difference. Somebody said he weighed around 300, and somebody said he weighed, I mean, he did weigh 180, but then there was a statement that he might have weighed 200-something. Isn't that a part of this? No, no. There was no statement that he weighed 200-anything. Nobody said he weighed 200. The description given by Ann Dua was very specific. She identified a black male, 6'2", shaved head, 300 to 350 pounds. That's what she identified. Daryl Titus was 180 pounds at all times. In fact, the handwritten arrest report of Detective Roberts shows him at 180 pounds. Now, Detective Roberts in court says, well, he looks like he lost maybe 50 pounds. Yeah, I thought there was something about 50 pounds. Yeah, 50. That's what he said in court to buttress his position in contradicting his own handwritten arrest report. And what – no, there's a substantial discrepancy. I mean, you know, Judge Stevens, I think Stevens, the first judge, you know, we were in his chambers, and the first thing he said, well, is Jenny Craig involved in this? That's a joke that he cracked because – Didn't she identify him from the first photo lineup based on what the photo showed? She identified him. She went to court based on that identification of the lineup. No, sir. She did not identify him. What happened in the lineup is she was exposed to the lineup. She couldn't identify anybody. Time went by. Her husband came in. The sheriff maneuvered and pointed, is that him? Is that him? Is that him? Finally, he got her to pick Darryl Titus. So she did identify him. She failed. They completely failed. The lineup completely failed in violating every single rule of lineups. She veiled the lineup. And so did Delgado. Delgado failed completely, and he assisted her in picking somebody out, even though the sheriff said he failed completely. She did not pick Titus. And when they went to the courtroom for the preliminary hearing, this was in March of 2005, they were sitting next to each other in the courtroom. They were sitting next – Mr. and Mrs. Titus were sitting next to Mr. and Mrs. Delgado, and I provided supplemental testimony from Mrs. Titus. And so they didn't recognize him. Now, Sheriff Roberts took them to a small room, showed them the photographs, and instructed them, this is who you have to pick. And so they came out, and they picked Mr. Titus at the preliminary hearing, based upon the instructions of Sheriff Roberts. So this was a tainted identification at the preliminary hearing. The lineup was tainted. The identification was tainted. Now, three months later, he spent three months in jail waiting for his trial date. At trial, she said, I don't recognize him. I don't recognize him. And that's when she was telling the truth. She did not recognize Mr. Titus. Nothing had changed in the appearance of Mr. Titus. Actually, he had gained some weight because he's sitting around idle, doing nothing, probably eating himself out of an emotional depression. So he had actually gained 10 pounds. But the lineup was tainted in the first place. The preliminary hearing identification was tainted. And she says, again, that she knew specifically that Mr. Titus was not Big D, for convenience's sake, Big D is the 350-pounder. She knew, specifically knew that. After the preliminary hearing, she said that, not at the preliminary hearing. Well, she said it in a deposition testimony. So whether she meant at the preliminary hearing, whether she meant at the trial, she knew it wasn't him. Well, that matters, doesn't it, when she began to realize that that was the wrong person. And apparently, she realized it after the preliminary hearing. I would say she had done it. She realized it at the preliminary hearing. If she needed assistance in picking Mr. Titus at the preliminary hearing, again, we have a problem as a disputed fact at this point. That's where we're ending up. I mean, it's a disputed fact. Now, she may say that. She hasn't. She's never said that. But if she does, we have a disputed fact. So, you know, again, the problem with this, I think this should be tried. I think that the – by the way, I wanted to synthesize the court to an issue here, which the court is not aware of. We had a discovery stay in effect. We had a discovery stay in effect, so we couldn't take depositions. We had a stay order from Judge Stevens, because what Judge Stevens had in mind – Are you talking about Judge Wilson? Judge Wilson, I'm sorry. What Judge Wilson had in mind is he wanted to try the qualified immunity issue separately, and once we're done with that, then he was going to open discovery and we get to discover everything else. So, you know, we're necessarily confined by a lot of evidence, so it's not well-exposed, but I think there's substantial disputed facts, enough certainly to warrant a trial for both – for all of the defendants. And, again, I mean – I don't see your theory of liability against the management company. Theory of liability against the management company is based upon the fact that Andujo Delgado was simply discharging their work duties. They go to court often because they evict tenants. In fact, we submitted evidence that GMK and East 35th Apartments had been to the court where there's almost 300 cases on record. And, in fact, they did go and evict – they went actually to trial for an unlawful detainer case and they evicted the Hawkins. They evicted Hawkins. And then, even at – you know, so they evicted Hawkins. They actually went to hearing and they're delegated with going to court, and they should at least be instructed or trained that they need to tell the truth, that this is a very important process, penalty of perjury. And there's – there are legal implications if you go in there and disregard the process and play with it. And that's – that's what I think that – So you're – is it straight – these are on your State law claims, like a straight respondeat superior? Yes. Yes. Which – That only – now only comes into play if it's a 1983 claim. I'm sorry, Your Honor. Now only comes into play if it's a 1983 claim, right? Right. And, Your Honor, I mean, this issue was not taken up by either Judge Wilson or Judge Wright. And Judge Wright said, well, I'm not going to take up this issue. I'm not going to make any decisions towards it, because the Conduva and Delgado are dischargeable in summary judgment, so there's no – it's moot. And he's right about that. So the Court hasn't given any thought process, hasn't waived the evidence regarding the liability of G&K and East 35th Street Apartments. And frankly, I mean, we're in agreement with Judge Wright, except this idea that they're not malice based upon their declaration. They have no malice. And, of course, if there was no malice element, they're out. Again, there's another thing that we disagree with Judge Wright on, and he indicates that a litigation privilege discharges the Title VII case. And we disagree with that, because within times, it's very clear that it does not. Kimes is a Ninth Circuit case. I haven't heard any other Ninth Circuit case that says otherwise. Title VII remains no matter what, pursuant to law. We'll yield to opposing counsel for any questions. Thank you, counsel. Thank you, Your Honor. Good morning, Your Honor. I represent the apartment appellees, G&K Management, and East 35th Street. What I want to deal with first is the state action part, in terms of current law. In the summer judgment motion, there was no evidence that showed there was any direct act by the management in terms of involvement in this prosecution. Law enforcement had never contacted G&K or East 35th Street Apartments. What was the ruling with respect to your client? I thought we just heard that Judge Wright never reached your client's liability. Well, what Judge Wright did, we presented the argument. What Judge Wright said was the litigation privilege applies, and that he did not see the sufficient evidence of malice. He thought it was an error. And we had argued there's not going to be vicarious liability under 1983. So in terms of conduct, that was what was dealt with at the court. But look at the state under the state claims. On the state claims, what we dealt with essentially was, was there evidence of negligence? Was there sufficient evidence that G&K was vicariously responsible for their acts? So the focus was really on the acts of the individuals. And what he said is that this was essentially a mistake. Our point is that the issue was undisputed in either case, and that is, was there any evidence presented by the plaintiffs in opposition to our motion to show direct involvement of the apartment defendants? And that is, were we contacted by law enforcement? But if the theory is vicarious liability, they don't have to show direct involvement. Right, but there's not going to be vicarious liability under 1983. Right. So I'm talking specifically about the state claims. In fact, I'm going to put all the cards on the deck. Okay. I'm talking specifically about the malicious prosecution claim, where it sounds like there may be some factual disputes, or at least it's very close now as a state claim. So there you could be held vicariously liable without a direct act. Well, if we look at the malicious prosecution claim, if we first deal with the communication, the communication here that they're talking about is what was in court, and the court considered that issue. Are you saying they were acting outside the scope of their employment when they went to court and did the photo op and did all of these things, or were they acting within the scope of their employment, or do you not want to make a statement on that? I'd like to make a statement on that, Your Honor, because what we presented in our motion is here are the employment guidelines. Here it sets forth what they're required to do. It delineated the section 7, section 3 of the guidelines set forth in the employment contract. It said that you are under the supervision when you go to court on an eviction hearing. This is not an eviction hearing. And it said that you are to comply with certain guidelines in terms of processing someone for eviction. It did not describe duties that they should undertake when interfacing with law enforcement. And if, in fact, they did something that went awry, it's not within their job description. It's not part of what we're asking them to do. And so that was set forth in the papers. There was the employment contract. There was Sarah Head's declaration delineating what those responsibilities were and why this did not fall within that domain. And so for the court, it becomes essentially a moot point if you say that that's not controverted. It's been established that this is something that would go beyond it in either case. So in terms of the malicious prosecution, essentially, even if the plan is correct, it would not be within the course and scope. And they didn't say, well, here's why it should be nonetheless. There was no evidence presented. They deposed Sarah Head. So in terms of the declaration, they were free to refer to her testimony and say, well, wait a minute, that's not exactly what your employees do and do not do. And I don't think you can have a law that says because this particular defendant is in court regularly for unlawful detainer actions or eviction actions, that, therefore, any time one of their employees happens to go to court, either traffic court or is a witness to a crime and is asked by law enforcement to come in, that that all of a sudden extends the umbrella and says, that's covered as well. And I think their other argument was, well, you should have trained them on how to tell the truth. I don't think that that is something that you can apply here and say, okay, every employer has some obligation to tell all the employees, if you ever call them to testify, here's what you're supposed to do. They're working with law enforcement directly, and there's no evidence that anyone on a supervisory level was called in to participate in this at all. You haven't said anything about the California privilege to assist law enforcement in the prosecution of people suspected of crimes. There's a California law privilege. Yes. Doesn't that play into the malicious prosecution claim? Right. And in terms, well, I think it more principally with Andujo and Delgado. But with respect to my client, we're even one step removed. We should be afforded the privilege to say it would be improper for us. Whoa, whoa, whoa. If they're outside the scope of their employment, you don't get their privilege. Right. But, I mean, if you play both sides of the coin, and you said, following Your Honor's saying, okay, does their privilege apply, which would presume that you're saying, are they acting the course of scope? If they're not, then I don't even have to concern myself with it. But if they are, then I do afford myself with it. I think that if you take the plaintiff on his face and say they're acting up, that they're doing these acts, they would be outside the course of scope. Assuming, on the other hand, we're afforded that privilege, it would be improper for us to intercede and start second-guessing them or saying, here's what we want you to do when you're interfacing with law enforcement. Law enforcement would legitimately say, why are you stepping in the middle of this? It's not your place to do that. And they never said anyone on a supervisory level was a persecutant witness to any of these alleged acts. There was also a state claim under the Bain Act, and I saw no evidence of coercion or intimidation or anything of that sort. So in our papers on the summary judgment motion, we said, what does this have to do with this case? What does this have to do with the apartment defendants under the Bain Act? There was some argument being proffered that, well, does the statutory privilege in state court have any bearing or any effect on a federal claim? And what we pointed out in the papers is that you've got federal case law that is almost identical to what the state system is, which would apply as well. And so we were afforded those same privileges under the litigation privilege. If there are any questions, I can respond. It's under California state law to have the privilege, though. Don't you have to be acting without malice? I didn't see any evidence of malice on my client's part. Well, that's the question you're saying is. Is it an absolute privilege? Well, no, Your Honor. If there's malice, of course, then there's a problem with it. But let's take it one at a time. If they're making a claim directly against my client, there's no evidence of any direct action that could be inferred or directly established that the apartment defendants acted maliciously. There's nothing to say, we directed them. No, go ahead and finger the wrong person. If you're going to say it's in terms of vicarious liability, again, we have the question, did they establish that this is in the course and scope? What we had was evidence showing why it would not be if it's as plaintiff says. Was that issue really litigated? I don't see it. It's not really one of the issues that she was addressing. It was, Your Honor, because what I did is I had a declaration from Sarah Head. We attached along with that. Is this in your brief? I mean, it's not what it – They didn't raise it on their appeal. Why would they? I mean, it doesn't seem like the judge ruled on it. Well, the judge did not rule on vicarious liability, but in terms of the privilege argument and whether that applies, what we said is – what they argued is, well, malice applies, and here's why. We say we're not responsible in terms of malice, and we did argue that issue. So I can't tell you exactly if the court delineated in that fashion what the argument was presented. I don't know if I've answered your question sufficiently. Well, usually we don't rule on things that the district court hasn't ruled on. Well, the matter was not disputed on the papers, and so I think the court might say it was not in dispute. You're fading the question. The problem is we're a reviewing court. We can only decide, rule on what the district court did. Right. But one could ask, was the matter even in dispute? One could ask that. Thank you, Your Honor. Thank you. There's 44 seconds left for your side. You didn't leave me very much time. I thought I covered the points, but I can reserve them. No, no, someone's getting up behind you. Good morning. My name is Alvin Hong, and I represent Edmond Duho and Jose Delgado. They are entitled to the protections of the litigation privilege, even though they misidentified Mr. Titus and indicated that he was the person who was the perpetrator of the crimes. Well, does that privilege apply to the 1983 claim? Well, the answer to that question is no. It doesn't apply to the 1983 claim. But in order for the 1983 claim to apply, there has to be some showing of state action, which is sorely missing in this situation. Unless there were a conspiracy between Robert and Titus. Unless there was a conspiracy. So that's a real issue. Well, the evidence of conspiracy is tenuous at best. It's based upon an allegation that they met in a room and he prepared them somehow for testimony. But that's not what actually occurred. It's tenuous at best. Well, are those disputed facts? I would say that that's not a disputed fact. That's not a disputed fact. What went on in the room? We don't know what went on in the room because there hasn't been discovery of that yet. No, we don't know what went on in the room, although the depositions of Officer Roberts, if his deposition was taken, as were my clients, and there's no evidence from either of them. As a matter of fact, there's an explicit denial that anything nefarious took place or anything that would otherwise influence the outcome of the criminal trial occurred. In this situation, the one exception to the litigation privilege has to do with whether there's malice or not. And it seems to me that the appellants have essentially conceded that there's no direct evidence of malice. So the next stage of the analysis has to do with Singleton and whether there can be showing of an honest and sincere belief on the part of my clients that they have identified the right person. The real challenge that we have here is that you can tell from the record how my clients struggled trying to make the identification. It's a cross-racial identification, and you can see at one moment they seem to be very uncertain at the beginning, particularly Ms. Andujo. She goes into the preliminary hearing stage. She's not sure. Why doesn't she just tell the truth and say, I'm not sure? Well, because she genuinely believes that she has the right person. And she ultimately does admit that she's unsure, but not until we arrive at the trial stage. Why doesn't her testimony tell the truth right at the preliminary hearing when she has the opportunity to do that? Well, the problem is that she has a genuine belief that she is telling the truth, but she has some question in her mind. She's not sure that that's the right person. In large measure, it's because of the size disparity. That's right. And I agree, in retrospect, it probably would have been in everyone's best interest for her to be more uncertain about her testimony. For her to be more truthful about her testimony. And, Your Honor, that doesn't change whether she is entitled to the benefit of litigation privilege. That identification, it's a misidentification, no doubt. But that identification was done in good faith. But for some additional information, including where the child was born or the person who had been serving time, the case was pretty packed. That's correct. I agree with that, Your Honor. There's been a policy decision made, though, by the California legislature that there's a greater interest in protecting those who might come forward with information so that crime can be prosecuted, with the risk that, under certain circumstances, perhaps this one, that someone might be wrongfully prosecuted. That's a value judgment that has been made. And it underlies the litigation privilege as contained in the Civil Code. What do you see as a narrow issue before us? What do we have to decide? You have to decide whether there's an exception to the privilege, whether the burden has been met to show that the exception of malice applies. Is that for the jury to decide whether there was malice? Or is that a preliminary legal question? That is a question that, based on the evidence that was before the district court, was decided and was decided correctly. I believe that any other evidence that might be brought forth is tenuous at best. And the evidence that was before the judge at the district level was satisfactory to establish an absence of malice. There are no facts that we have before us that the record contains that suggest anything else. All right. Well, counsel, you're well over the time allotted. Do you want to just sum up? Well, let me just interrupt you for a minute. When do you measure the malice? What is the relevant point? Is it at the time that they initially go to the police and say somebody damaged our car? Or does it occur, assuming that was done in good faith, can malice enter the picture later when they're involved in identifying Titus, misidentifying Titus? Yes. I believe that malice can develop at any point along the continuum until the conclusion of the litigation, meaning that if at the outset she identifies Mr. Titus knowing that it's not him, knowing that it's not him, then that would constitute malice. If anywhere along the continuum, say, for example, if at the preliminary hearing she decides that it's not him and her good faith, honest, sincere belief dissipates and she doesn't step forward and say something in that regard, then perhaps malice is there because she knows that it's not the right person. But we don't have any evidence of that here. As a matter of fact, the very first time that she makes any mention of the fact that she thought it might not be him was after the litigation had concluded in its entirety and she is leaving the premises and she says to her husband in passing, you know, reconfirming that she knew it wasn't him. She just had a feeling it wasn't him. So why did she come forward then? We had a case, Peeble v. Goldstein, very similar situation. This man we freed for actual innocence. He was on, I guess he was convicted of murder based on, in part, a witness who got on the stand and said, yeah, that was him, got off the stand, told the police officer, I don't think it was him. And the police officer said, get out of the courtroom right now. Get out of the courtroom. I don't want you to testify. She wanted to testify. She wanted to go back and say, you know, I misstated that. It wasn't him. This man served, I don't know, 30 years in prison on wrongful charges and ultimately was freed and ultimately now is suing. Not the witness. The witness wanted to do the right thing. Your client knew it wasn't him and didn't even try to go back and didn't. She had another chance. She had the trial. Actually, she did, during the course of the trial, indicate that it was not him. That's what brought the proceedings to a halt. When she was asked to identify the individual who perpetrated the crime. When did she know it wasn't him? Right after the preliminary hearing. Well, she had concerns along the way. She wasn't certain. It was uncertainty. But uncertainty does not arrive at the level of malice. It's simply a mistake. It's a mistake in identity. Well, isn't that a question of fact for the jury, as Judge Swarzer suggests? I believe that there's enough evidence, Your Honor. The record shows. It isn't sufficiency. It's whether there are genuine issues of material fact. No, I don't believe that there's an issue of material fact with respect to that. Because the evidence that would support that seems to be absent from the record. All right. Thank you, counsel. Titus v. County of Los Angeles is submitted. Does anyone feel they want to take a break? I'm fine. I'm fine. I'm fine. Okay. We'll take out the United States v. Cap.
judges: Farris, Wardlaw, Schwarzer